Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| **JOCELYN ROMERO ROMERO**<br><br>Apelante<br><br>v.<br><br>**SOUTH AMERICAN RESTAURANTS CORP.**, conocida como **CHURCH'S CHICKEN**<br><br>Apelada | KLAN202300452 | Apelación procedente del Tribunal de Primera Instancia, Sala de Carolina<br><br>Caso Núm.: **CA2021CV00670 (407)**<br><br>Sobre: Despido Injustificado (Ley Núm. 80), Discrimen (Ley Núm. 100), Ley de Represalia en el empleo (Ley Núm. 115-191) |

Panel integrado por su presidente el Juez Figueroa Cabán, la Jueza Grana Martínez y el Juez Pérez Ocasio.

Grana Martínez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de diciembre de 2024.

La apelante, Jocelyn Romero Romero, solicita que revoquemos la Sentencia en la que el Tribunal de Primera Instancia (TPI) declaró NO HA LUGAR la demanda por despido injustificado, represalias y discrimen por raza.

La parte apelada, South American Restaurants Corp., presentó su oposición al recurso.

Los hechos que preceden la controversia que hoy atendemos son los siguientes.

**I.**

La apelante presentó una querella contra la apelada al amparo del procedimiento sumario laboral establecido en la Ley Núm. 2 de 17 de octubre de 2017, 32 LPRA sec. 3118 et. seq. La señora Romero Romero alegó que South American la despidió sin justa causa de su empleo, debido a su raza y en represalias por

---

[1] Véase Orden Administrativa OATA-2023-131 del 14 de julio de 2023, donde se designa al Juez Alberto Luis Pérez Ocasio en sustitución del Juez Fernando L. Rodríguez Flores.

quejarse de su supervisora. La querella incluyó las alegaciones siguientes. La querellante comenzó a trabajar para la querellada en julio de 2007 como asistente de gerente. Durante el año 2012 fue ascendida a Gerente General en el Restaurante Church de la Avenida Campo Rico de Carolina. A mediados del año 2018 recibió un aumento de salario debido a su desempeño. La querellante nunca fue objeto de amonestaciones, suspensiones ni medidas disciplinarias previo a su despido. Al momento de su despido, el 11 de noviembre de 2019, ocupaba un puesto de Gerente General. Fue despedida por la Gerente de Área, la señora Angélica Torres que es de raza blanca. La señora Angélica Torres fue trasladada al área donde trabajaba la señora Romero Romero a mediados de agosto de 2019.

Según la apelante, desde el mes de septiembre de 2019, la señora Torres comenzó a discriminar en su contra. La apelante alegó que Torres incurrió en un patrón de: (1) actos intencionales irrazonables e infundados, (2) trato despectivo, fuerte y hostigante, (3) falta de profesionalismo, (4) actitudes intimidantes, hostiles y ofensivas frente a otros empleados y personas, (5) utilizó frases hirientes y amenazantes, (6) hacia alarde de sus despidos de gerenciales, (7) reuniones y llamadas telefónicas, luego de la jornada laboral por asuntos insignificantes que podían atenderse durante el horario de trabajo y (8) acudió a su restaurante en sus días libres y de vacaciones para buscar información en su contra. La señora Romero Romero alegó que fue despedida como represalia por la querella que presentó el 3 de octubre de 2019 en el Departamento de Recursos Humanos contra la señora Torres y por negarse a discriminar o tomar medidas ilícitas hacia otro empleado gerencial. Por último, adujo que fue sustituida por otra persona de raza blanca, pero con menos experiencia y educación.

La apelada negó las alegaciones en su contra y adujo que el despido fue justificado. El patrono argumentó que la querellante cometió una conducta grave porque: (1) incurrió en la práctica de falsificar información relacionada al inventario, (2) instruyó a los cajeros que marcaran productos que no eran despachados en las órdenes, (3) incumplió con las normas relacionadas al despacho y registro de comidas de empleados y (4) continuó con la conducta, a pesar de la advertencia de que el asunto sería referido al Departamento de Recursos Humanos.

El TPI declaró NO HA LUGAR la demanda, luego de realizar la vista en sus méritos. El foro primario incluyó como parte de la sentencia los hechos estipulados en la Conferencia con Antelación al Juicio que son los siguientes:

a. La querellante comenzó sus labores para la querellada como Asistente de Gerente para julio de 2007 en el Restaurante Church's de Campo Rico, Carolina, Puerto Rico.

b. El 24 de marzo de 2008, la querellante renunció a su empleo y luego fue contratada nuevamente el 22 de julio de 2008, como Asistente de Gerente en el Restaurante Church's de la Avenida Escorial en Carolina.

c. En el año 2012 la querellante fue ascendida al puesto de Gerente General en el Restaurante Church's de Campo Rico, Carolina, Puerto Rico.

d. El Sr. Néstor Cruz recomendó a la querellante para ascenso al puesto de Gerente General.

e. La querellante fue despedida de su empleo efectivo el 11 de noviembre de 2019.

f. La querellante era una empleada a tiempo indeterminado.

g. La querellante era una empleada exenta.

h. La querellante recibía una compensación económica por concepto de salarios.

i. El salario más alto devengado por la querellante durante los tres años anteriores al despido fue de $625.00 semanales.

j. La querellante es de la raza negra.

k. Entre los deberes de la querellante mientras trabajaba para la querellada estaban:

1) Capacitación de los asistentes gerenciales para la posición de gerente, al igual que con su equipo de trabajo.

2) Mantener un control absoluto del restaurante.

3) Preparación de horarios de los gerenciales y empleados.

4) Preparación de compras.

5) Manejo de situaciones en el empleo.

6) Control de costos.

7) Servicios al cliente.

8) Reclutamiento de empleados.

9) Supervisión, dirección y disciplina a empleados.

El foro apelado, además, determinó los hechos a continuación:

l. A mediados de 2018, la querellante obtuvo un aumento de salario por concepto de retención y desempeño.

m. La decisión del despido de la querellante fue tomada en conjunto por la Sra. Marlen Rosa, la Sra. Angélica Torres, la Sra. Ivelisse Cordovés, la Sra. Denise Rivera y el Sr. Héctor Montañez.

n. La determinación del despido se la notificó a la querellante el Sr. Héctor Montañez y la Sra. Denise Rivera. La Sra. Marlen Rosa también estuvo presente en dicha reunión.

o. La Sra. Angélica Torres y la Sra. Marlen Rosa, quienes ocupaban el puesto de Gerente de Área, hicieron varias auditorías en el restaurante de Campo Rico durante los meses de septiembre de 2019 a noviembre de 2019.

p. El día 3 de octubre de 2019, mientras la querellante se encontraba en las oficinas centrales de la empresa, se acercó a la Sra. Moraima Anibarro en el área del comedor mientras ésta almorzaba y le comentó quejas en cuanto a la Sra. Angélica Torres por su forma de supervisión en relación con las reuniones de gerenciales, sus visitas a los restaurantes y sus mensajes y llamadas de seguimiento.

q. La Sra. Anibarro se reunió con los gerenciales del área de la querellante y éstos le corroboraron los comentarios de la querellante sobre los métodos de supervisión y seguimiento de la Sra. Torres. Luego de

ello, la Sra. Anibarro notificó el resultado de las entrevistas a la Sra. Ivelisse Cordovés y a la Sra. Denise Rivera.

r. La Sra. Cordovés dialogó con la Sra. Angélica Torres sobre las quejas. La Sra. Angélica Torres reconoció la conducta que fue objeto de algunas de las quejas en su contra, expresando que sus métodos de trabajo estaban dirigidos a mejorar el funcionamiento de los restaurants del área, lo cual le habían encomendado. Como parte de la conversación, se le pidió a la Sra. Torres que tomara en cuenta los comentarios de los gerenciales y que tratara de ajustar sus métodos de supervisión sin afectar su misión de mejorar el desempeño de los restaurantes.

s. En ocasiones, las reuniones realizadas por la Sra. Angélica Torres pueden haberse extendido más allá del turno de trabajo asignado a la querellante y a los otros gerenciales del área de Carolina.

t. Cuando la querellante tenía horarios de apertura, los mismos comenzaban a la 5:00 a.m.

u. La composición laboral de los Gerentes Generales en la misma área geográfica de la querellante a la fecha de los hechos pertinentes a esta acción eran los siguientes: Jocelyn Romero, de la raza negra, Gerente General del restaurante de Campo Rico; Wilfredo Meléndez, de la raza negra, Gerente General del restaurante de Simón Madera; Jonalis Bristol, de la raza negra, Gerente General del Centro Judicial; Lisayra Negrón, de la raza blanca, Gerente General, Plaza Carolina; Nilda Jiménez, de la raza blanca, Gerente General, Shopping Court; y Migdalia Torres, de la raza blanca, Gerente General, Plaza Escorial.

v. Luego del despido de la querellante, la Sra. Aixa Rivera, quien se desempeñaba como Gerente Fast Track, fue asignada para hacerse cargo del restaurante de Campo Rico interinamente hasta el 2 de marzo de 2020, fecha en que se le designó al puesto en propiedad.

w. La Sra. Aixa Rivera es de raza blanca.

x. Previo a instar la presente acción, la querellante radicó una querella en la Unidad Anti-discrimen, el 26 de diciembre de 2019. La Unidad Anti-discrimen emitió la carta para demandar el día 15 de diciembre de 2020, notificada por correo el 17 de diciembre de 2020.

El TPI resolvió que la apelante no probó el alegado discrimen por raza. El foro apelado concluyó que se probó el primer requisito, ya que las partes estipularon que la apelante fue despedida el 11 de noviembre de 2019. No obstante, determinó que no se configuró

el segundo requisito porque la apelante no demostró la ausencia de justa causa para el despido. Por el contrario, el TPI determinó que hubo justa causa porque la evidencia presentada demostró que la apelante infringió al menos tres normas del Manual de Empleados. El TPI quedó convencido de que la apelante violó la normas número 58, 66 y 67 del manual de empleados de la empresa. El foro primario advirtió que la norma número 58 prohíbe y tipifica como conducta grave el realizar transacciones que no están permitidas en la caja registradora y el dejar de registrar transacciones adecuadamente. Según consta en la sentencia, una primera ofensa a la norma número 58 es razón suficiente para el despido. El foro primario hizo hincapié en que: (1) la apelante admitió que realizó transacciones no permitidas en la caja registradora, (2) la querellada presentó más de 80 transacciones registradas o aprobadas por la apelante entre el 3 de agosto de 2019 hasta principios de noviembre de 2019 que no eran permitidas por la empresa, (3) la apelante efectuó transacciones como cajera en las que marcó cantidades exageradas de productos extras que no fueron despachados a los clientes y (4) aprobó descuentos exagerados de extras realizados por cajeros bajo su supervisión.

El foro apelado no acogió las excusas de la apelante para justificar su conducta. La apelante alegó que los defectos del sistema SARCO ocasionaban un problema con el inventario y que utilizaba la práctica de marcar extras para cuadrar la varianza de la operación diaria. El TPI no dio por buena su justificación, porque esa conducta tenía un impacto económico adverso para la apelada. Dicho foro concluyó que la práctica asumida por la apelante alteraba los registros de inventario de la apelada, debido a que: (1) reducía productos en el inventario que realmente no se habían despachado y (2) la falsificación de la varianza generaba

información incorrecta e impedía atender cualquier deficiencia real de productos o del inventario.

El TPI determinó que la apelante no demostró que en los demás restaurantes tenían la práctica generalizada de incluir en los recibos cantidades exageradas de productos. Además, determinó que la apelante solo presentó dos recibos de otros dos restaurantes. Según el TPI, uno era del 18 de octubre de 2019 y pertenecía a Plaza Carolina. A su juicio se demostró que era un caso aislado y que Angélica Torres amonestó verbalmente a la gerente. El foro apelado señaló que ese hecho fue corroborado por la testigo de la apelante, Lisayra Negrón. Dicho foro concluyó que del segundo recibo no se podía colegir ninguna anomalía o incumplimiento con las normas de SARCO. El TPI no quedó desapercibido de que al menos dos gerentes de turno del restaurante de Campo Rico incurrieron en la misma conducta que la apelante y que no surgió prueba de que fueron disciplinados. No obstante, advirtió que ambos gerentes eran supervisados por la apelante y que esa distinción no condonó sus actuaciones ni convirtió su despido en injustificado.

Según el TPI, la apelante no estableció la inexistencia de justa causa para su despido. Por el contrario, concluyó que la apelada presentó prueba preponderante de que el despido fue justificado, porque la apelante violó las normas del Manual de Empleados en las que se establece que el falsificar documentos o información contenida en documentos y la alteración de recibos, de documentos y transacciones son conductas graves suficientes para el despido como primera ofensa.

Al TPI le quedó claro que la apelante tampoco cumplió con el tercer requisito para demostrar la existencia de una causa de acción de discrimen por raza. El foro primario reconoció que las partes estipularon que la apelante pertenece a la clase protegida y

que fue sustituida por otra que no es del mismo grupo. No obstante, advirtió que lo estipulado no es suficiente para que se configure el discrimen por raza. El foro apelado concluyó que: (1) la apelante no presentó evidencia indicativa de la modalidad de discrimen por raza relacionada a algún incidente particular como comentarios, (2) la apelante admitió que la señora Torres trata de la misma forma a todos los gerentes, (3) se estipuló que la composición étnica de los demás gerenciales no reflejaba algún tipo de discrimen por raza y (4) Marien Rosa es negra y participó en la investigación que se realizó sobre la apelante y recomendó su despido, debido a la gravedad de las violaciones cometidas.

El TPI resolvió que la apelante tampoco demostró que fue víctima de discrimen por represalias. Aunque reconoció que la apelante probó un caso prima facie de represalias, concluyó que el patrono logró controvertir esa presunción. Según el TPI, la queja que la apelante dio a Moraima Anibarro sobre Angélica Torres configuró la actividad protegida, debido a que subsiguientemente fue despedida. No obstante, concluyó que la apelada controvirtió la presunción porque, demostró una razón legítima y no discriminatoria, para despedir a la apelante. El TPI dio por hecho que no hubo represalias, debido a que: (1) la apelada probó que la investigación que la señora Angélica Torres hizo sobre la apelante comenzó antes de que la señora Romero Romero presentara la queja, (2) no se estableció que la señora Angélica Torres conocía de la queja en su contra cuando realizó la investigación, (3) Angélica Torres consideraba que la queja en su contra era generalizada de todos los gerenciales por su seguimiento constante y por las reuniones, luego de culminado el turno, (4) las personas que tomaron la decisión conjunta del despido desconocían que la apelante presentó una queja contra Angélica Torres, (5) no fue hasta que la apelante acudió a la Unidad Anti-discrimen del

Departamento del Trabajo que advinieron en conocimiento de la querella contra Angélica Torres, (6) la decisión de despedir a la apelante fue tomada conjuntamente por Angélica Torres, Marien Rosa, Héctor Montañez y Denise Rivera y consultada con la Vice Presidenta de Recursos Humanos.

Según el TPI, los testigos de la apelante no refutaron que la apelada demostró que cometió una conducta grave prohibida en el Manual de Empleados. El TPI advirtió que sus testigos se limitaron a declarar que trabajaban bajo su supervisión y sobre su buen desempeño como empleada y supervisora. No obstante, hizo hincapié en que reconocieron que la práctica de marcar extras no despachados era común, pero incorrecta.

Por otro lado, el TPI reconoció que los testimonios de la señora Negrón y la señora Torres comprobaron los problemas con la implementación del nuevo sistema NBO. Según el TPI, de sus testimonios surge que, en ocasiones, el sistema no permitía marcar correctamente los ingredientes y los extras que pedían los clientes.

El TPI concluyó que el despido fue justificado, debido a que los propios testigos de la apelante aceptaron que no era correcto marcar ingredientes extras si no se despacharon. El foro apelado advirtió que las señoras Calcaño y Alvarado reconocieron que la práctica de marcar extras era común pero incorrecta y concluyó que no existía evidencia de que otros restaurantes incurrieron en la misma práctica. El TPI desestimó la querella con perjuicio, debido a que la apelante fue despedida, luego de una investigación en la que se descubrió su reiterado incumplimiento con las normas de la empresa. El foro quedó convencido de que su despido no guardó relación alguna con su color de piel, ni con la querella que hizo contra su supervisora, Angélica Torres.

La apelante presentó este recurso en que alega que:

**Primer Error**

Erró el Honorable Tribunal de Primera Instancia, Sala de Carolina al no tomar en consideración determinaciones de hechos adicionales presentadas por la parte apelante de conformidad con la prueba desfilada y en permitir prueba presentada tardíamente por la parte apelada a pesar de la oportuna objeción acorde con las Reglas de Evidencia de Puerto Rico de 2009, 32 LPRA Ap. VI.

**Segundo Error**

Erró el Honorable Tribunal de Primera Instancia, Sala de Carolina, al determinar que no aplicaba la presunción de despido injustificado de la Ley Núm. 80 de 1976, según enmendada, 29 LPRA sec. 185 et seq., en el caso de autos, a pesar de que la empleada fue contratada con anterioridad a la vigencia de la Ley Núm. 4 "Ley de Transformación y Flexibilidad Laboral," 29 LPRA sec. 121 et seq. en contravención con el derecho aplicable.

**Tercer Error**

Erró el Honorable Tribunal de Primera Instancia, Sala de Carolina, al haber desestimado la reclamación de despido injustificado acorde con la Ley Núm. 80 de 1976, según enmendada, 29 LPRA sec. 185 et seq., fundado en evidencia documental inadmisible, a pesar de la oportuna objeción de la parte apelante constituyendo dicha determinación un error extraordinario y manifiesto.

**Cuarto Error**

Erró el Honorable Tribunal de Primera Instancia, Sala de Carolina, al haber desestimado la reclamación de represalias acorde con lo dispuesto en la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, 29 LPRA sec. 194 et seq. al concluir que aunque la apelante demostró su caso *prima facie* de represalias, la apelada pudo controvertir y fundamentar una razón legítima y no discriminatoria para el despido, basado en evidencia documental inadmisible, a pesar de la oportuna objeción de la parte apelante constituyendo dicha determinación un error extraordinario y manifiesto.

**II.**

**A.**

**AUTENTICACIÓN DE EVIDENCIA**

La Regla 901 de Evidencia, 32 LPRA Ap. VI, gobierna el procedimiento de autenticación e identificación de evidencia. El inciso A establece que la admisibilidad de la evidencia está sujeta a

que se cumpla con el requisito de autentificación o identificación como una condición previa. El requisito de autentificación o identificación se satisface cuando se presenta evidencia suficiente para sostener que la materia en cuestión es lo que el proponente sostiene. El estándar de suficiencia de la prueba es menor que la preponderancia de la prueba y mucho menor que fuera de toda duda razonable. La determinación del juzgador de que se presentó prueba suficiente para autenticar el objeto y admitir la evidencia, no será alterada en apelación salvo un claro abuso de discreción. La evidencia debidamente autenticada será admisible a menos que el tribunal la excluya al amparo de la Regla 403 de Evidencia, 32 LPRA Ap. VI, o que opere alguna regla de exclusión de derecho probatorio. No obstante, el valor probatorio que se debe otorgar a la evidencia admitida es una decisión posterior y aparte que no debe confundirse con el análisis de autenticación. *Rosado Reyes v. Global Healthcare,* 205 DPR 796, 812-813 (2020).

El inciso B nos provee ejemplos de la forma en que la evidencia puede ser autenticada o identificada. Estos ejemplos no son limitantes. La controversia que nos ocupa requiere que evaluemos la aplicación del inciso B, que permite la autenticación de la evidencia mediante un testigo con conocimiento de que una cosa es lo que se alega y del inciso 11, que establece que la prueba puede ser autenticada mediante la cadena de custodia. El Tribunal Supremo resolvió en *Pueblo v. Carrasquillo Morales,* 123 DPR 690, 697-698 (1989), que la cadena de custodia se establece con el testimonio de un testigo con conocimiento personal sobre la custodia o trayectoria del objeto desde su ocupación hasta su presentación en el juicio o vista. Su propósito es evitar error en la identificación del objeto y demostrar que la evidencia presentada no ha sufrido cambios sustanciales desde que se ocupó el día de los hechos.

**B.**

**IMPUGNACIÓN DE TESTIGOS**

La credibilidad de un testigo puede impugnarse mediante cualquier prueba pertinente. El inciso 6 de la Regla 608 B de Evidencia, 32 LPRA Ap. VI, permite la presentación de prueba relacionada a la existencia o inexistencia, falsedad, ambigüedad o impresión de un hecho declarado por el testigo. La presentación de esa prueba está sujeta a lo dispuesto en la Regla 403 que permite la exclusión de evidencia pertinente, debido a que su admisión ocasiona perjuicio, confusión o pérdida de tiempo. El único propósito de la prueba de impugnación es retar la veracidad de un testimonio y no puede ser utilizada como evidencia sustantiva. La evidencia impugnatoria no prueba los hechos en controversia. *Ortiz v. Cruz Pabón,* 103 DPR 939, 946 (1975).

La prueba impugnatoria se divide en específica y no específica. Un testigo puede impugnarse con prueba directa o específica que ataque su testimonio y que tienda a establecer que ha incurrido en contradicciones. La impugnación también puede realizarse, mediante el uso de evidencia no específica, para atacar al testigo como tal de forma general, como es el caso de las impugnaciones por parcialidad e interés. Cualquier evidencia extrínseca será admisible para contradecir a un testigo y demostrar que mintió en la silla testifical. La prueba extrínseca para impugnar un testigo por contradicción es rutinariamente admisible. La impugnación por contradicción se puede realizar mediante: (1) el contrainterrogatorio que es el método más utilizado, (2) otro testigo que contradiga al que se pretende impugnar, (3) conocimiento judicial y (4) la presentación de evidencia material o documental. *Berríos Falcón v. Torres Merced,* 175 DPR 962, 974 (2009).

El tribunal debe sopesar si la impugnación es a base de evidencia extrínseca colateral o no colateral. La evidencia colateral no va directamente a la controversia litigiosa y meramente pretende atacar algo que no es relevante para resolver el caso. No obstante, la evidencia extrínseca colateral, en ciertas ocasiones, dilata innecesariamente el procedimiento judicial y puede crear confusión, provocar errores inadvertidos o perjuicio indebido. Por su parte, la evidencia no colateral va dirigida a una de las controversias litigiosas del caso y puede utilizarse para impugnar la credibilidad de un testimonio mediante evidencia extrínseca testifical, material o documental. La determinación de si la evidencia es colateral descansa en la sana discreción del Tribunal de Primera Instancia. No obstante, cuando un interrogatorio es impugnado por contradicción, no hay diferencia si lo que se pretende establecer es colateral o no. La prueba de impugnación por contradicción solo es admisible para demostrar las falsedad o incongruencia de un testimonio, nunca para probar conducta específica en determinado momento. La impugnación de los testigos es uno de los mecanismos más eficaces de cumplir con el principio cardinal de nuestro sistema de justicia que es descubrir la verdad. Aunque su propósito es menoscabar la credibilidad de un testigo, no puede utilizarse como un subterfugio para introducir evidencia que de otra forma no se podría admitir. El propósito de la impugnación por contradicción es simplemente atacar instancias específicas de un testigo demostrando que su declaración es falsa, inexacta, poco probable o errónea. El principio cardinal de la prueba de impugnación es contradecir lo declarado, frente al juzgador de los hechos. *Berríos Falcón v. Torres Merced,* supra, págs. 974-975.

**C.**

**DESPIDO INJUSTIFICADO**

El Tribunal Supremo de Puerto Rico aclaró en *Ortiz Ortiz v. Medtronic*, 209 DPR 759 (2022), si las enmiendas introducidas por la Ley Núm. 4 de 2017 conocida como Ley de Transformación y Flexibilidad Laboral, 29 LPRA sec. 121 y siguientes, sobre el esquema probatorio de las reclamaciones laborales al amparo de la Ley Núm. 80 son retroactivas. Esta legislación fue aprobada para proteger a los empleados de actuaciones arbitrarias y desalentar los despidos injustificados mediante remedios económicos. Sus propósitos primordiales son: (1) desalentar la práctica de despedir empleados sin justa causa y (2) proveer a los empleados remedios consustanciales a los daños causados por los despidos injustificados. El Art. 1, 29 LPRA sec. 185 (a), concede una indemnización económica al trabajador contratado sin tiempo determinado que trabaja mediante remuneración y que es despedido sin justa causa. El resarcimiento se conoce como mesada y es el remedio exclusivo para los empleados despedidos injustificadamente, en tanto no existan otras causas de acción independientes al despido.

La Ley Núm. 80, *supra*, no define lo que es el despido injustificado. Sin embargo, expone de forma ilustrativa ciertas instancias en las que se justifica el despido de un empleado por parte del patrono y que están fundamentadas en la conducta del empleado y en razones de índole empresarial. La violación reiterada de las reglas y reglamentos razonablemente establecidos para la operación del establecimiento suministrados oportunamente al empleado son justa causa para el despido. Todo contrato de empleo tiene la condición expresa o implícita de que el empleado habrá de cumplir con los deberes de su empleo de forma competente. No obstante, el despido motivado por el capricho del

patrono o sin una razón vinculada con el buen y normal funcionamiento del establecimiento, no se considera justa causa. 29 LPRA sección 185 b (3). La ausencia de irrazonabilidad en las exigencias de conducta de los empleados puede convertir el despido en caprichoso o arbitrario. La ley no dispone un mínimo de amonestaciones, antes de que el patrono pueda despedir al empleado justificadamente, ni tampoco que la amonestación debe hacerse en determinada forma. Cuando el despido obedece a violaciones a las normas del empleo, el patrono tiene que demostrar que: (1) las reglas para el funcionamiento del establecimiento son razonables, (2) le suministró una copia escrita de las normas al empleado y (3) el empleado las violó reiteradamente. *Ortiz Ortiz v. Medtronic,* supra, págs. 772-774.

La Ley Núm. 80, *supra,* establece una presunción de despido injustificado. Al patrono le corresponde derrotar esa presunción con prueba preponderante que existe justa causa para el despido. La presunción establecida en la Ley 80, *supra,* invierte el orden de la prueba en casos civiles y le impone al patrono el deber de probar *in limine* que el despido fue justificado. Ley Núm. 80, *supra,* contiene una excepción a la norma general de que el reclamante es quien está obligado a probar sus alegaciones para prevalecer en un pleito. No obstante, para activar la presunción es necesario que el demandante demuestre que hubo un despido. Una vez que la presunción se activa, el patrono está obligado a aportar prueba para rebatir la presunción y persuadir al juzgador mediante preponderancia de la evidencia. *Ortiz Ortiz v. Medtronic,* supra, págs. 774-775.

La Ley de Transformación y Flexibilidad Laboral que entró en vigor en enero de 2017, enmendó de la Ley 80, *supra,* la frase que le imponía el peso de la prueba al patrono. El Art. 12 de La Ley Núm. 4, *supra,* establece que los empleados contratados con

anterioridad a su vigencia continuarán disfrutando los mismos derechos y beneficios que tenían previamente, según lo dispuesto expresamente. Por su parte, el Art. 7.3 establece que la Ley Núm. 4, *supra,* regirá inmediatamente después de su aprobación. Una ley podrá tener efectos retroactivos cuando surja expresa o tácitamente de la intención legislativa. No obstante, en ausencia de esa intención, la ley que aplica es la vigente al momento de los hechos que dan lugar a la causa de acción. La intención legislativa del efecto retroactivo de una ley debe estar clara, porque la retroactividad es una excepción a la regla general. No obstante, debe quedar claro que la regla de hermenéutica que desfavorece la retroactividad de las leyes aplica solamente a disposiciones estatutarias de carácter sustantivo. La regla es a la inversa en las leyes procesales, que tienen efecto retroactivo y se aplican a los casos pendientes, salvo que la Asamblea Legislativa disponga lo contrario. *Ortiz Ortiz v. Medtronic,* supra, págs. 776-778.

En *Ortiz Ortiz v. Medtronic,* supra, el patrono alegó que el TA aplicó incorrectamente el estándar de prueba de la Ley Núm. 80, *supra,* que establecía la presunción de despido injustificado. Medtronic adujo que aplicaba la enmienda de la Ley Núm. 4 que eliminó la presunción, porque la querella se presentó posterior a su aprobación. El patrono también alegó que la eliminación de esa presunción es una norma procesal aplicable a todo caso pendiente, independientemente de que haya sido presentado con anterioridad a la vigencia de las enmiendas. El Tribunal Supremo de Puerto Rico no le dio la razón al patrono, porque la disposición enmendada no es de aplicación retroactiva. Según el Tribunal Supremo, la disposición aplicable es la vigente al momento de los hechos que dan lugar a la causa de acción por despido injustificado. En ese caso, el demandante fue contratado y despedido antes de que entraran en vigor las enmiendas de la

reforma laboral. Por esa razón, el Tribunal Supremo resolvió que aplicaba la presunción de despido injustificado existente antes de la enmienda.

### D.

### Ley de Represalias

La Ley Núm. 115-1991, 29 LPRA sec. 194 et seq., establece una política pública a favor de proteger los empleos de los trabajadores. La protección establecida cobija a los trabajadores de las instrumentalidades del Estado Libre Asociado y a los del sector privado, cuando comparecen ante los foros legislativos, administrativos o judiciales para prestar su colaboración. *Feliciano Martes v. Sheraton,* 182 DPR 368, 392 (2011). Esta legislación protege al trabajador de represalias por parte del patrono, por dar su testimonio, proveer información o hacer expresiones verbales o escritas ante esos foros. *SLG Rivera Carrasquillo v. AAA,* 177 DPR 345, 361 (2009); *Ocasio v. Kelly Servs.,* 163 DPR 653, 684 (2005). Sus protecciones se extienden a acciones en las que las represalias son por acudir a un supervisor o al Departamento de Recursos Humanos del patrono. 29 LPRA sec. 194 (B)(A).

Si la reclamación de represalias prospera, el demandante podrá recibir una indemnización por: (1) los daños reales sufridos, (2) las angustias mentales, (3) la restitución en el empleo, (4) salarios y beneficios dejados de percibir y (5) honorarios de abogado. 29 LPRA sec. 194 (b).

El empleado puede establecer un caso de represalias de dos maneras distintas. La primera es mediante evidencia directa o circunstancial que demuestre un nexo causal entre la conducta del patrono demandado y el daño sufrido. La segunda es estableciendo una presunción *juris tantum* o un caso *prima facie.* La presunción se activa cuando el empleado prueba que: (1) participó en una actividad protegida por la ley y que (2) subsiguientemente fue

despedido, amenazado o discriminado en su empleo. Una vez el empleado prueba su caso *prima facie,* al patrono le corresponde rebatir la presunción. El patrono tiene que alegar y fundamentar una razón legítima y no discriminatoria para la acción adversa. Al empleado le corresponde demostrar que la razón que el patrono alega es un mero pretexto para la acción adversa. Art. 2 (c) de la Ley Núm. 115, *supra; SLG Rivera Carrasquillo v. AAA,* supra, pág. 362. La proximidad temporal es suficiente para establecer el tercer requisito de un caso *prima facie.* El empleado tiene que demostrar que la acción adversa ocurrió al poco tiempo de haber incurrido en la alegada actividad protegida. *Feliciano Martes v. Sheraton,* supra, págs. 397 y 399. No obstante, en ausencia de prueba de proximidad puede demostrar el nexo causal mediante evidencia de que: (1) recibió un trato distinto a otros empleados, (2) existió un patrón de conducta antagónica en su contra, (3) las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias y (4) cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal. *Feliciano Martes v. Sheraton,* supra, pág. 400.

**III**

El apelante alega en su primer señalamiento de error que el TPI determinó hechos e hizo conclusiones de derecho contradictorios con lo estipulado y cuestiona la autenticación y la admisibilidad como prueba impugnatoria del exhibit número 9 de la apelada.

El primer señalamiento de error no se cometió. Las determinaciones de hecho que cuestiona la apelante no son contrarias a las estipulaciones ni a los testimonios presentados.

La representación legal de la apelante cuestiona las determinaciones de hecho número sesenta y cinco (65) y sesenta y seis (66) que son las siguientes:

65. Durante el proceso de la investigación relacionada con el marcado de productos "extras" en el restaurante de Campo Rico y la determinación del despido de la querellante, la Sra. Angélica Torres no tenía conocimiento sobre el hecho de que la querellante había presentado una queja en su contra a la Sra. Moraima Anibarro. La señora Angélica Torres solo supo lo que le indicó la Sra. Ivelisse Cordovés a los efectos de que los empleados gerenciales del área de Carolina se habían quejado sobre su trato en cuanto al seguimiento constante y las reuniones luego de que ellos habían culminado su turno.

66. La Sra. Angélica Torres advino en conocimiento sobre el hecho de que la querellante se había quejado con la Sra. Moraima Anibarro cuando la querellante presentó su querella ante la Unidad Anti-Discrimen.

La representación legal de la apelante sostiene que las determinaciones de hecho que anteceden son contrarias a la estipulación de hecho (r) que es la siguiente.

r. La Sra. Cordovés dialogó con la Sra. Angélica Torres sobre las quejas. La Sra. Angélica Torres reconoció la conducta que fue objeto de algunas de las quejas en su contra, expresando que sus métodos de trabajo estaban dirigidos a mejorar el funcionamiento de los restaurant[e]s del área, lo cual le habían encomendado. Como parte de la conversación, se le pidió a la Sra. Torres que tomara en cuenta los comentarios de los gerenciales y que tratara de ajustar sus métodos de supervisión sin afectar su misión de mejorar el desempeño de los restaurantes.

Una mera lectura hace más que evidente que no existe contradicción alguna entre las determinaciones de hecho número 65 y 66 y la estipulación (r). El TPI dio por hecho que: (1) Angélica Torres desconocía en el momento que habló con la Sra. Cordovés e hizo la investigación, que la apelante fue la persona que le dio la queja en su contra a Moraima Anibarro, (2) la Sra. Cordovés solo le informó a Angélica Torres que los gerenciales se quejaron de su seguimiento constante y de las reuniones luego del turno y, (3) Angélica Torres se enteró de que la apelante se quejó en su contra con Moraima Anibarro, cuando acudió a la Unidad Anti-Discrimen del Departamento de Trabajo. Las partes estipularon que: (1) la

Sra. Cordovés y la Sra. Angélica Torres dialogaron sobre las quejas, (2) Angélica Torres reconoció la conducta objeto de algunas de las quejas en su contra y explicó que sus métodos de trabajo estaban dirigidos a mejorar el funcionamiento de los restaurantes del área, según le fue encomendado, (3) a la Sra. Torres se le pidió que tomara en cuenta los comentarios de los gerenciales y que tratara de ajustar sus métodos de supervisión, sin afectar su misión de mejorar el desempeño de los restaurantes.

Una simple lectura de la determinación de hecho número 68 y de la estipulación (p) nos obliga a concluir que tampoco existe contradicción alguna.

El TPI determinó que:

68. La querellante admitió que el trato del que ella se quejaba en cuanto a la Sra. Angélica Torres (en términos de dar seguimiento constante por teléfono y mensajes de texto incluso fuera de horas laborables) era igual con todos los gerenciales.

Las partes estipularon que:

p. El día 3 de octubre de 2019, mientras la querellante se encontraba en las oficinas centrales de la empresa, se acercó a la Sra. Moraima Anibarro en el área del comedor mientras ésta almorzaba y le comentó quejas en cuanto a la Sra. Angélica Torres por su forma de supervisión en relación con las reuniones de gerenciales, sus visitas a los restaurantes y sus mensajes y llamadas de seguimiento.

La determinación de hecho núm. 68 tampoco es inconsistente con lo estipulado. El TPI dio por hecho que: (1) la querellante admitió que el trato de la Sra. Angélica Torres del que se quejaba era igual al que le daba a todos los gerenciales y (2) que dicho trato consistía en el seguimiento constante por teléfono y en el envío de mensajes de texto, incluso fuera de horas laborables. Las partes estipularon que: (1) el 3 de octubre de 2019, la querellante se acercó a Moraima Anibarro y le comentó unas quejas sobre Angélica Torres, (2) las quejas estaban relacionadas a la forma de supervisión de Angélica Torres respecto a las reuniones

de gerenciales, sus visitas a los restaurantes y sus mensajes y llamadas de seguimiento.

Las determinaciones de hecho cuestionadas están avaladas por los testimonios no controvertidos. La propia apelante dijo que Angélica no tenía un buen trato hacia nosotros, en referencia a los gerentes, y que, en vez de recibir su apoyo o ayuda, les metía más presión.[2] El uso del plural por parte de la apelante confirma que la señora Angélica Torres actuaba de la misma forma con todos sus supervisados y que la señora Romero no recibía un trato distinto a los demás. Durante el contrainterrogatorio, la apelante admitió que Angélica Torres trataba a todos los gerentes por igual en el chat. La apelante contestó afirmativamente, cuando se le preguntó si Angélica Torres trataba de la misma forma a los demás gerenciales.[3]

Moraima Anibarro Díaz confirmó que la apelante se quejó del trato de Angélica Torres *a todos los gerenciales.* La supervisora de Recursos Humanos declaró que la mayor queja de la apelante era por el seguimiento constante que la señora Torres le daba *a todos los gerenciales,* cuando tenían un caso o alguna situación. Según la testigo, la apelante se quejó porque Angélica Torres *les* daba mucho seguimiento por teléfono y mensajes de texto en horas y días de trabajo, así como en las horas y los días libres. La señora Anibarro dijo que la apelante le informó sobre un comentario que Angélica Torres *le hizo a otra empleada de nombre Jonalis Bristol.*[4]

No obstante, del testimonio de la señora Anibarro no surge que la apelante le diera una queja específica sobre el comportamiento de Angélica Torres hacia su persona. La señora Anibarro contestó ninguna, cuando se le preguntó si la apelante presentó una queja por el trato despectivo o por comentarios

---

[2] Véase, págs. 115-116 de la Transcripción.
[3] Véase, pág. 180 de la Transcripción.
[4] Véase, pág. 891 de la Transcripción.

impropios o discriminatorios de la señora Angélica Torres.[5] La testigo fue enfática en que todos los comentarios estaban relacionados a las molestias que tenían todos los gerentes.[6] Durante el contrainterrogatorio se reafirmó en que la apelante *hizo una queja generalizada de todo el grupo de gerenciales*.[7] Según la testigo, los demás gerentes confirmaron el constante seguimiento por mensajes de texto y llamadas.[8]

La apelante, además, cuestiona en el primer señalamiento de error, la autenticación y admisibilidad como prueba impugnatoria del exhibit número 9 de la apelada, que consiste en la tabla Excel sobre las transacciones realizadas en el Restaurante de Plaza Escorial que preparó Marlen Rosa y una copia impresa del reporte de sistema Aloha de ese restaurante. La prueba fue ofrecida para impugnar la credibilidad de la gerente de esa tienda, Migdalia Torres, sobre la práctica de marcar extras no despachados. La representación legal de la apelante cuestiona su admisibilidad en sustitución del testimonio de la señora Migdalia Torres, debido a que no se estableció la cadena de custodia conforme a la Regla 901 (b) 11, *supra,* y la objetó porque: (1) la apelada no la anunció y la presentó tardíamente, a pesar de que estaba en su control, (2) la apelada no estableció la cadena de custodia, (3) la señora Rosa admitió que incluyó en su tabla Excel información que no estaba certificada por un gerente del sistema SARCO, (4) no se proveyó prueba independiente del administrador del programa ni certificación sobre de dónde provino la data provista y (5) el TPI permitió que las testigos de la apelada declararan sobre prueba documental extrínseca a los hechos que conocían.

La apelada alega que procede la admisión como prueba extrínseca de impugnación en sustitución del testimonio de la

---

[5] Véase, págs. 893-894 de la Transcripción.
[6] Véase, pág. 894 de la Transcripción.
[7] Véase, págs. 898-899 de la Transcripción.
[8] Véase, pág. 903 de la Transcripción.

señora Migdalia Torres. Su representación legal aduce que la prueba fue debidamente autenticada por el testimonio de la señora Marlen Rosa. No obstante, advierte que su testimonio es suficiente para impugnar a la señora Torres, porque Marlen Rosa fue la persona que realizó la investigación y no encontró ninguna transacción de descuento de empleados con extras en Plaza Escorial.

Según consta en la Transcripción, la prueba impugnada se presentó originalmente durante el testimonio de la señora Migdalia Torres que, para la fecha de los hechos, era la Gerente General de Plaza Escorial. La testigo declaró que: (1) los demás restaurantes, incluyendo Plaza Escorial, utilizaban la práctica de marcar extras, porque el cambio de sistema ocasionó un descuadre en el inventario[9], (2) ella marcaba extras en las comidas de los empleados, (3) esa era una práctica común y (4) utilizó esa práctica desde agosto de 2019 hasta mediados de octubre de ese año.[10]

La representación legal de la apelada confrontó a la señora Migdalia Torres con evidencia sobre todas las transacciones de comida de empleados de su restaurante, Plaza Escorial, obtenida del sistema de computadora de Church.[11] La apelante objetó su admisibilidad, porque desconocía qué era el documento, quién lo hizo y cuándo.[12] El abogado de la apelada argumentó que el documento contenía un listado con todas las transacciones de descuentos de empleados hechas en Plaza Escorial, durante el período que Angélica Torres hizo la investigación. Según alegó, el documento contenía transacciones del 15 de agosto de 2019 al 19 de octubre de 2019.[13] No obstante, lo retiró porque la señora

---

[9] Véase, págs. 311-312, 314-315, 317-318 de la Transcripción.
[10] Véase, págs. 354, 355, 357 de la Transcripción.
[11] Véase, pág. 358 de la Transcripción.
[12] Véase, pág. 359 de la Transcripción.
[13] Véase, pág. 360 de la Transcripción.

Migdalia Torres no pudo autenticarlo e informó que lo presentaría nuevamente con un testigo de la compañía.[14]

El abogado de la apelada presentó nuevamente la evidencia impugnada durante el testimonio de la señora Marlen Rosa Martínez. La testigo es Gerente de Área de la apelada, donde trabaja desde el 16 de septiembre de 2019.[15] La señora Rosa declaró que: (1) se involucró personalmente con Angélica en la investigación sobre transacciones de productos extras que se realizó restaurante por restaurante y no encontraron que existiera esa práctica[16], (2) desde que empezó trabajó en la transición y adiestramiento de los nuevos sistemas[17], (3) fue adiestrada para poder verificar todos los sistemas y (4) estuvo mano a mano con Angélica en toda la investigación.[18] La señora Rosa explicó cómo hizo la investigación en el sistema Aloha.[19] La testigo reafirmó que: (1) investigó personalmente con Angélica Torres restaurante por restaurante, (2) podía asegurar que los demás restaurantes no seguían la práctica de marcar los extras, (3) en Plaza Carolina se identificó un solo incidente, (4) en el Centro Judicial también se identificó únicamente un recibo, (5) en los recibos de empleados y de clientes de los demás restaurantes no se encontraron productos no entregados, marcados en exceso y (6) la investigación de cada restaurante se hizo desde que se instaló el nuevo sistema.[20]

El representante legal de la apelada confrontó a la señora Rosa con el testimonio de Migdalia Torres de que ella personalmente marcaba extras en los descuentos de empleados. La señora Rosa desmintió el testimonio de la Gerente de Escorial. La testigo declaró que hizo una investigación completa de ese

---

[14] Véase, pág. 365 de la Transcripción.
[15] Véase, pág. 1397 de la Transcripción.
[16] Véase, pág. 1403 de la Transcripción.
[17] Véase, pág. 1399 de la Transcripción.
[18] Véase, pág. 1409 de la Transcripción.
[19] Véase, pág. 1402 de la Transcripción.
[20] Véase, págs. 1404-1409 de la Transcripción.

restaurante desde que se instaló el sistema Aloha, descuento por descuento, buscó quién los aprobó y qué tenían marcado y encontró cero descuentos alterados.[21]

La apelada volvió a ofrecer el informe con todas las transacciones de descuento de empleados realizadas en el restaurante de Plaza Escorial, desde que se instaló el sistema Aloha, con el objetivo de impugnar el testimonio de Migdalia Torres. Su representación legal explicó que la señora Torres reconoció que en el sistema tenía que existir constancia de los extras que marcó en las comidas de los empleados.[22]

La apelante se opuso a admitir la prueba porque: (1) siempre ha estado bajo el control del apelado y es parte de otro documento que no pudo tener en el descubrimiento de prueba, (2) es una evidencia sustantiva *self service* disfrazada de impugnación, (3) debió presentarse durante el testimonio de Migdalia Torres, y (4) la intención de la apelada era traer prueba sustantiva que debió presentar en su momento y no el último día de la vista.[23]

La apelante no demostró que el foro primario cometió un claro abuso de discreción al admitir la evidencia que cuestiona. No encontramos razón alguna para intervenir con la determinación del juzgador, de que la apelada presentó prueba suficiente para autenticar la evidencia impugnada. La apelada cumplió con el requisito de autenticación de la prueba, porque presentó evidencia suficiente para sostener que la materia en cuestión es lo que sostiene. La apelante argumenta que la prueba no fue autenticada correctamente porque no se estableció la cadena de custodia. Sus argumentos no son convincentes.

La tabla Excel sobre las transacciones realizadas en el Restaurante de Plaza Escorial y el reporte impreso obtenido del

---

[21] Véase, págs. 1444-1445 de la Transcripción.
[22] Véase, págs. 1445-1446 de la Transcripción.
[23] Véase, págs. 1453-1455 de la Transcripción.

sistema Aloha de ese restaurante fueron debidamente autenticados, mediante el testimonio detallado de la señora Rosa. Esta testigo fue quien preparó la tabla Excel, a base de la información obtenida del sistema del restaurante y fue quien hizo la investigación en el sistema, al que logró acceso a través de su contraseña y número de usuario y quien imprimió el documento. La testigo declaró que: (1) fue quien preparó el documento con información desde el día que Escorial empezó con el sistema, (2) llenó día por día los descuentos con fecha y hora, el nombre del empleado asignado a la caja donde se procesaron, el gerente que los autorizó, su huella y si había extras identificados, (3) el documento que preparó tenía cuatro (4) páginas y que de la quinta (5ta) en adelante era el reporte de Aloha del sistema del restaurante, (4) en ese sistema se segregan todos los descuentos de empleados y contiene la información que usó para preparar la tabla Excel.[24] A la pregunta de quién imprimió los documentos, contestó yo, Marlen Rosa.[25]

La señora Rosa explicó que: (1) como Gerente de Área tiene acceso a ese tipo de reporte, a través del sistema Aloha, y que puede seleccionar el restaurante y la información que quiere que genere el reporte[26], (2) la información en el documento impresa y la que surge del sistema electrónico es exactamente igual, (3), simplemente tiene que imprimir el documento, (4) el reporte no se puede alterar, no se le puede añadir ni quitar nada, ya que solo puede imprimirse, (5) no tiene acceso para alterar los reportes creados en Aloha y nadie más puede hacerlo, porque es un programa electrónico que no puede ser alterado[27], (6) el sistema le pide su *password*, su usuario y su número, para acceder a la información de todos los restaurantes a su cargo, (7) el sistema

---

[24] Véase, pág. 1494 de la Transcripción.
[25] Véase, pág. 1497 de la Transcripción.
[26] Véase, págs. 1497-1498 de la Transcripción.
[27]Véase, pág. 1498 de la Transcripción.

solo le provee acceso a esos restaurantes, (8) después que selecciona el restaurante, el sistema sube toda la data de esa tienda incluyendo el área que se llama *Audit Report*, donde puede escoger el reporte que quiere ver, (9) las únicas opciones que provee el sistema son *display* y *printer* y (10) el sistema no falló mientras verificó el reporte e hizo la tabla.[28]

Según la testigo, el comentario de la señora Migdalia Torres era totalmente falso, porque los extras tenían que constar en los reportes. La señora Rosa explicó que incluyó en la tabla transacción por transacción y no se encontró esa práctica. La testigo dijo que la investigación realizada en el Escorial la llevó a concluir que, en ese restaurante, no se alteraron los recibos de descuentos de empleados con marcas de productos extras excesivos no despachados. Fue enfática en que no se encontró ninguna alteración desde que se instaló el sistema.[29]

A nuestro juicio, la evidencia impugnada fue debidamente autenticada. El estándar de suficiencia de la prueba aplicable a la autenticación de evidencia es menor que la preponderancia de la prueba y mucho menor que fuera de toda duda razonable. Sin lugar a duda, el testimonio de la señora Rosa cumplió con el estándar de suficiencia de la prueba.

La tabla Excel que preparó la señora Rosa sobre las transacciones realizadas en el Restaurante de Plaza Escorial y el reporte impreso obtenido del sistema Aloha de ese restaurante son admisibles para impugnar el testimonio de Moraima Torres. El inciso 6 de la Regla 608 B de Evidencia, *supra,* permite la presentación de prueba relacionada a la existencia o inexistencia, falsedad, ambigüedad o impresión de un hecho declarado por el testigo, para impugnar su testimonio. La señora Moraima Torres

---

[28] Véase, págs. 1506-1508 de la Transcripción.
[29] Véase, págs. 1521-1522 de la Transcripción.

declaró que, en su restaurante, tenía la práctica de marcar productos extras no despachados y reconoció que esas transacciones tenían que estar evidenciadas en el sistema. El Tribunal Supremo de Puerto Rico ha reconocido la admisibilidad de cualquier evidencia extrínseca para contradecir a un testigo y demostrar que mintió en la silla testifical, incluyendo evidencia documental. *Berríos Falcón v. Torres Merced,* supra. La prueba documental que presentó la apelada contradice el testimonio de la señora Torres, porque demuestra que en su restaurante no existía la práctica de marcar extras que no fueron despachados.

No obstante, advertimos que la admisibilidad de la evidencia para impugnar el testimonio de Moraima Torres, no afecta de forma alguna nuestra determinación sobre la justa causa del despido y la falta de una causa de acción por represalias.

La apelante sostiene en el segundo señalamiento de error, que el TPI se equivocó al no aplicar la presunción de despido injustificado. Su representación legal aduce que la presunción aplica, porque los hechos ocurrieron antes de la vigencia de las enmiendas que eliminaron esa presunción.

La apelada sostiene que aplica la Ley Núm. 4, *supra,* que eliminó la presunción de despido injustificado, porque el despido ocurrió con posterioridad a que esa legislación entrara en vigor, el 26 de enero de 2017.

El patrono tiene razón. La ley aplicable es la Ley Núm. 4, *supra.* El Tribunal Supremo de Puerto Rico resolvió que la ley aplicable es la vigente al momento de los hechos que dan lugar a la causa de acción por despido injustificado. La apelante fue despedida el 11 de noviembre de 2019. A esa fecha, la ley aplicable era la Ley Núm. 4, *supra,* que entró en vigor en el mes de enero de 2017.

La apelante no probó un caso de despido injustificado conforme al estándar de prueba de la Ley Núm. 4, *supra,* que eliminó la presunción que existía a su favor. El apelado cumplió con la carga procesal de demostrar justa causa para el despido. La apelante reconoció que cometió la conducta por la cual fue despedida. La apelante nunca negó que tenía la costumbre de marcar extras, no despachados, en los recibos de los empleados y de los clientes. La señora Romero declaró que en ningún momento dijo que no se hacía.[30] No obstante, intentó justificar su conducta con la excusa de que era una práctica normal y usual que se hace y hacía en los restaurantes de sus inicios en el 2017.[31] La apelante alegó que esa era una práctica generalizada que tenían todos los gerentes para solucionar los problemas de inventario que ocasionó la implementación de un nuevo sistema. Sin embargo, no pudo establecer una relación entre las fallas del sistema y las irregularidades que se le imputaron.[32]

Los testimonios no controvertidos y la evidencia documental que presentó la apelada demostraron que la conducta por la que la apelante fue despida no era una práctica generalizada de los demás gerentes. Angélica Torres supervisaba a la apelante al momento de su despido. La señora Torres declaró que, en las tiendas de Campo Rico, Simón Madera y Carolina Shopping Court, no se encontró un solo caso y que, en Plaza Carolina, se encontró un caso.[33] Sin embargo, en la tienda de la apelante hubo ochenta (80) hallazgos.[34] El testimonio de la señora Torres no fue controvertido por la apelante.

El señor Héctor Montañez Andino era Director de Operaciones de la apelada. Su testimonio confirmó que se realizó

---

[30] Véase, pág. 129 de la Transcripción.
[31] Véase, pág. 119 de la Transcripción.
[32] Véase, págs. 156-158 de la Transcripción.
[33] Véase, págs. 591, 592, 593 de la Transcripción.
[34] Véase, pág. 593 de la Transcripción.

una investigación en todos los restaurantes y no se encontró nada similar a lo ocurrido con la apelante.[35] El testigo dijo que los recibos encontrados en otras tiendas con esa práctica eran de casos aislados.[36] Wilfredo Meléndez Ruíz es Gerente del restaurante de Plaza Carolina y confirmó que la práctica de marcar extras no es permitida, si el cliente no los solicita y negó que dicha práctica estuviera ocurriendo.[37] La señora Aixa Rivera Agosto es otra Gerente que declaró que la práctica de marcar productos extras que el cliente no pide, no es permitida.[38]

Marlen Rosa es Gerente de Área de la apelada y realizó la investigación sobre la apelante junto a Angélica Torres. La testigo dijo que: (1) no era cierto que en otros restaurantes ocurriera lo mismo que en Campo Rico[39], (2) todos los descuentos de empleados con productos extras marcados en exceso y no despachados, encontrados en la tienda de Campo Rico, fueron aprobados por la apelante[40], (3) no se encontró la misma práctica en Escorial[41], (5) los hallazgos de Campo Rico no se identificaron en ninguno de los otros restaurantes del área[42], (6) se identificaron sobre ochenta (80) transacciones de descuentos de empleados alteradas con productos extras excesivos no despachados aprobados por la apelante[43], (6) se identificó un descuento no autorizado en la tienda de Plaza Carolina y otro en la del Centro Judicial, dos restaurantes, (7) en esos casos no hubo despidos, porque fue un solo incidente que no comparaba con las ochenta (80) transacciones que autorizó la apelante y la cantidad de extras marcados, tampoco se asimilaba[44].

---

[35] Véase, pág. 928 de la Transcripción.
[36] Véase, pág. 984 de la Transcripción.
[37] Véase, págs. 1287-1288 de la Transcripción.
[38] Véase, pág. 1324 de la Transcripción.
[39] Véase, págs. 1404 a 1406 de la Transcripción.
[40] Véase, pág. 1409 de la Transcripción.
[41] Véase, pág. 1522 de la Transcripción.
[42] Véase, pág. 1549 de la Transcripción.
[43] Véase, pág. 1550 de la Transcripción.
[44] Véase, pág. 1552 de la Transcripción.

A la señora Rosa se le presentó una tabla de Excel que contenía todos los descuentos de empleados de la tienda de Campo Rico aprobados por la apelante.[45] La testigo dijo tener conocimiento de ese documento porque es el fruto de su investigación y tiene su letra y marcas. Según la señora Rosa, el documento titulado *Audit Report* se sacó directamente del sistema Aloha y provee información de todas las transacciones y quién era el cajero.[46] La testigo identificó en el documento que la gerencial era la apelante.[47] Fue enfática en que investigó personalmente, verificó las transacciones de descuentos y quién las aprobó y no identificó ningún otro gerente con esa práctica.[48] La testigo dijo que ella misma accedió al sistema Aloha del restaurante Campo Rico y abrió el reporte donde se detallan todos los descuentos de empleados, los imprimió y su nombre aparece en los papeles que imprimió.[49]

La evidencia documental que presentó la apelada confirmó que en los demás restaurantes no existía la práctica generalizada de marcar en los recibos de los empleados y de los clientes productos extras no despachados y que esa conducta era únicamente realizada por la apelante. No obstante, aun en el supuesto de que fuera una práctica generalizada, no puede avalarse porque va contra las normas contenidas en el Manual de Empleados. Angélica Torres declaró que en el Manual de Empleados se prohíben ciertas conductas que son inaceptables y que las marcadas con asterisco son graves y pueden conllevar el despido como primera ofensa. Surge de su testimonio que, en el manual se prohíbe realizar transacciones no permitidas en las cajas registradoras o dejar de registrar transacciones

---

[45] Véase, pág. 1409 de la Transcripción.
[46] Véase, págs. 1431-1433 de la Transcripción.
[47] Véase, pág. 1435 de la Transcripción.
[48] Véase, págs. 1442-1444 de la Transcripción.
[49] Véase, pág. 1506 de la Transcripción.

adecuadamente. La testigo dijo que la norma 66 penaliza falsificar documentos o información contenida en documentos u otras fuentes de información sometida a la empresa.[50] Igualmente advirtió que la norma 68 prohíbe el fraude y la malversación de fondos, mediante la alteración de recibos u otros documentos.[51] La señora Torres responsabilizó a la apelante porque en el restaurante de Campo Rico se cumpliera con el reglamento de la empresa.[52]

Angélica Torres explicó por qué la práctica de marcar extras no despachados era perjudicial para la apelada. La testigo explicó que los costos de comida se controlan a través del inventario. Según la testigo, la práctica de marcar extras altera el inventario porque ocasiona que el departamento de compras reciba información incorrecta.[53] La señora Torres advirtió que los descuentos de empleados tampoco pueden llevar extras.[54] Durante el redirecto explicó que la alteración del inventario significa dinero.[55] La Gerente de Recursos Humanos, Denise Rivera Díaz, confirmó que la apelante alteró las transacciones del sistema de las cajas registradoras y que su conducta era grave, por la cantidad de transacciones y el exceso de productos marcados.[56] La testigo explicó que el Manual de Empleados prohíbe la alteración de transacciones en el sistema y establece que es una conducta grave que puede ocasionar el despido de la primera vez.[57] Por último, Marlen Rosa advirtió que la entrada de información falsa sobre la venta de un producto ocasiona una manipulación de la variante. La testigo explicó que llaman variante al número del inventario. Según la testigo, la variante indica cómo opera el negocio y su nivel de eficiencia en el uso del inventario. La señora Rosa advirtió que a

---

[50] Véase, págs. 845-846 de la Transcripción.
[51] Véase, pág. 846 de la Transcripción.
[52] Véase, pág. 848 de la Transcripción.
[53] Véase, págs. 514-515 de la Transcripción.
[54] Véase, pág. 520 de la Transcripción.
[55] Véase, pág. 787 de Transcripción.
[56] Véase, pág. 1126 de la Transcripción.
[57] Véase, pág.1127 de la Transcripción.

través de la variante puede saberse si hay buen uso del inventario, si falta mercancía y si existe descuido.[58]

El Manual del Empleado se admitió como evidencia. La norma 58 prohíbe transacciones no permitidas en las cajas registradoras y dejar de realizar transacciones adecuadamente. Por otro lado, la norma 68, penaliza el fraude y la malversación de fondos mediante la alteración de recibos, la producción de recibos falsos y la alteración de transacciones, entre otras cosas.

A nuestro juicio, los hechos cometidos por la apelante, hasta la reunión del 22 de octubre en la que se le informó sobre los hallazgos en su restaurante, son más que suficientes para su despido. No obstante, continuó con la misma conducta, a pesar de que en esa reunión fue advertida de que su caso iba a ser referido al Departamento de Recursos Humanos y de que no podía repetir dicha conducta. La apelante reconoció que durante la reunión realizada con Angélica Torres y Héctor Montañez fue informada sobre la investigación en su contra y advertida de que tenía que dejar la práctica de marcar extras.[59] Angélica Torres confirmó que la apelante fue advertida que no podía continuar con la práctica señalada, porque era una conducta totalmente prohibida y que su caso iba a ser referido a Recursos Humanos para tomar una decisión. Fue enfática en que la apelante fue advertida de que tenía que cesar esa práctica por completo.[60] No obstante, la testigo dijo que pesar de las advertencias encontró un recibo del 26 de octubre con la misma práctica. Según la testigo, esa transacción reflejó que la apelante incumplió con las instrucciones de dejar de marcar extras.[61] Fue confrontada con varios recibos que confirman que en el restaurante de la apelante se continuó con la práctica de marcar

---

[58] Véase, págs. 1535, 1537 de la Transcripción.
[59] Véase, pág. 126 de la Transcripción.
[60] Véase, págs. 553, 562 de la Transcripción.
[61] Véase, pág. 564 de la Transcripción.

extras no despachados en contra de las advertencias que se le hicieron.[62]

La señora Torres, además, declaró que el 2 de noviembre hizo una compra por servi-carro en la tienda de la apelante y en el recibo marcaron extras que no fueron despachados.[63] Según la testigo, luego de ese incidente, se reunió con Héctor Montañez, Denise Rivera y Marlen Rosa y tomaron la decisión de despedir a la apelante.[64] La apelante declaró que el día que Angélica Torres compró por servi-carro, ella estaba de vacaciones.[65] Su justificación no nos convence, porque fue instruida a no continuar con la práctica de marcar extras no despachados y debió advertirlo a sus empleados. El testimonio no controvertido de Angélica Torres está sustentado por el Informe de Transacciones del 26 de octubre y el recibo de compra del 2 de noviembre, debidamente admitidos como evidencia.

La apelante sostiene en el tercer señalamiento de error que la desestimación de la reclamación de despido injustificado está fundamentada en evidencia documental que es inadmisible y que objetó oportunamente. Su representación legal aduce que probó todos los requisitos de una causa de acción por despido injustificado. No obstante, señala que el TPI desestimó la reclamación a base de los Exhibits 5, 6, 7, 8 y 9 de la apelada que aduce objetó oportunamente.

La apelada argumenta que es falso que la apelante objetara la autenticación y admisibilidad de la evidencia a continuación.

El Exhibit 5 consiste en el Informe con Transacciones (*Audit Report*) realizadas en el restaurante de Campo Rico el 26 de octubre de 2021 con productos extras no despachados realizadas bajo la supervisión de la apelante, luego de que se le advirtió que

---

[62] Véase, págs. 564-574 de la Transcripción.
[63] Véase, pág. 576 de la Transcripción.
[64] Véase, págs. 584-587 de la Transcripción.
[65] Véase, pág. 132 de la Transcripción.

no podía continuar con esa práctica. No encontramos en la transcripción que la apelante impugnara su admisibilidad.[66]

El Exhibit 6 es el Informe con transacciones (*Audit Report*) realizadas en el restaurante de Campo Rico el 27 de octubre de 2021 con productos extras no despachados realizados bajo la supervisión de la apelante y luego de que se le advirtió que no podía continuar con esa práctica. No encontramos en la transcripción que la apelante impugnara su admisibilidad.[67]

El Exhibit 7 que es el Reporte preparado por Angélica Torres con ochenta (80) transacciones de comidas de empleados realizadas en el restaurante de Campo Rico que incluyen cantidades exageradas de productos extras aprobados por la apelante. No encontramos en la transcripción que la apelante impugnara su admisibilidad.[68]

El Exhibit 8 es el Reporte de Aprobaciones de transacciones de descuento de empleados con un desglose de las transacciones de comidas de empleados incluidas en el Exhibit 7 en el que se establece que la apelante las aprobó. No encontramos en la transcripción que la apelante impugnara su admisibilidad.[69]

El tercer señalamiento de error no se cometió porque leímos la transcripción y no encontramos que la apelante haya objetado la admisión de los Exhibits 5, 6, 7 y 8 de la apelada.

Por último, la apelante alega que el TPI se equivocó al concluir que no ocurrió un despido por represalias. Su representación legal alega que fue despedida por quejarse de su supervisora, Angélica Torres. La apelante no tiene razón. Los testimonios creídos y no controvertidos y la prueba documental estipulada demostraron que, la señora Romero era objeto de una investigación, antes de que hablara con Moraima Anibarro el 3 de

---

[66] Véase págs. 1432 a 1436 de la Transcripción.
[67] Véase, págs. 1437 a 1438 de la Transcripción.
[68] Véase, págs. 1408-1409, 526-535, 539 de la Transcripción.
[69] Véase, págs. 536-539, 1414-1415, 1007 de la transcripción.

octubre. La señora Angélica Torres declaró que el 21 septiembre realizó una auditoría en el restaurante de la apelante y encontró irregularidades en los recibos del día anterior, de la comida de cortesía de los empleados. La testigo explicó que los recibos eran extraños y sospechosos porque tenían cantidades exorbitantes e incluían ingredientes que no eran parte del producto. Además, explicó que los descuentos de empleados no pueden llevar extras.[70] Según la testigo, no le dijo nada a la apelante porque entendió que era pertinente consultarlo con su supervisor, Héctor Montalvo.[71] La testigo dijo que su supervisor le dio la instrucción de realizar una investigación y que en ese proceso se percató que el problema era recurrente y comenzó en el mes de agosto. Fue enfática en que realizó una investigación detallada de todas las transacciones de comida de empleados realizadas en el restaurante de Campo Rico.[72]

La señora Torres dijo que le dio la información a su jefe tan pronto pudo reunirla y también le hizo saber a Denise Rivera y a Marlen Rosa.[73] La propia apelante admitió que fue auditada en el mes de septiembre. A la apelante se le preguntó cuántas veces fue auditada entre los meses de septiembre a noviembre de 2019. La apelante contestó que fue auditada más o menos cuatro veces.[74] Las auditorías realizadas en el mes de septiembre forman parte de la evidencia estipulada.

Estimamos que la apelante no dio una queja personal contra Angélica Torres. Igualmente, estamos convencidos de que la señora Torres desconocía que la apelante fue la persona que habló con Moraima Anibarro sobre el descontento de los gerentes con su estilo de trabajo. Ambos hechos son relevantes para concluir que el

---

[70] Véase, págs. 513-514 de la Transcripción.
[71] Véase, pág. 525 de la Transcripción.
[72] Véase, págs. 526–527 de la Transcripción.
[73] Véase, págs. 550- 551 de la Transcripción.
[74] Véase, pág. 132 de la Transcripción.

despido de la apelante no fue una represalia. La señora Anibarro fue enfática en que la apelante no se quejó de que recibió un trato despectivo ni discriminatorio por parte de Angélica Torres.[75] La testigo dijo categóricamente que la apelante le habló sobre las molestias que tenían todos los gerentes.[76] Además, declaró que los gerentes le confirmaron las molestias y que concluyó que su disgusto era debido a la supervisión constante de Angélica Torres a la que no estaban acostumbrados.[77] El testimonio de Dennise Rivera confirma que la queja de la apelante no estaba basada en conducta dirigida específica y exclusivamente sobre su persona. La señora Rivera declaró que Anibarro le informó que la apelante le comentó la inquietud de todos los gerentes por el seguimiento y el horario de las reuniones pautadas por Angélica Torres.[78] Fue categórica en que esa queja no tuvo ningún efecto sobre el despido.[79] Por su parte, Angélica Torres confirmó que la señora Cordovés le habló sobre la queja generalizada que tenían los gerentes por su estilo.[80] Según la señora Torres, la queja no fue de la apelante, sino del grupo de gerentes de Carolina.[81] Fue enfática en que le dijeron que la queja era de ese grupo.[82]

**IV.**

A base de los fundamentos expuestos, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[75] Véase, pág. 893 de la Transcripción.
[76] Véase, pág. 894 de la Transcripción.
[77] Véase, pág. 895 de la Transcripción.
[78] Véase, pág. 1130 de la Transcripción.
[79] Véase, pág. 1134 de la Transcripción.
[80] Véase, pág. 603 de la Transcripción.
[81] Véase, pág. 604 de la Transcripción.
[82] Véase, pág. 606 de la Transcripción.